## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ANGÉLICA M. GONZÁLEZ BERRIOS<br><br>Plaintiff<br><br>v.<br><br>MENNONITE GENERAL HOSPITAL, INC.; ET AL.<br>Defendants | CIVIL NO.: 18-01146 (RAW)<br><br><br>Re.: EMTALA &<br>MEDICAL MALPRACTICE |

## MOTION IN LIMINE TO INCLUDE AND EXCLUDE EVIDENCE AT TRIAL

COMES NOW Plaintiff Angélica González Berrios ("Angélica"), through her undersigned attorneys, and respectfully states and prays as follows:

### I.    INTRODUCTION

In the present motion, Angélica seeks *in limine* relief under Fed. R. Evid. 801(2)(d) to include three videos posted in youtube by codefendant Mennonite General Hospital, Inc. (the "Hospital).[1]

The first video sets forth the Hospital's expectations, goals, vision and mission for the services offer to each person who visits its Emergency Room. The second video delineates what the Hospital's CEO has termed "the Mennonite Experience." The third video in turn delineates the Hospital's zero error policy.

As explained more fully below, each video constitutes relevant evidence under Fed. R. Evid. 401 & 402.  The videos also constitute opposing party statements admissible under FED. R. EVID. 801(d)(2)(B)-(D).

---

[1] The Hospital has stipulated the video's authenticity for purposes of FED. R. EVID. 901.

Angélica also seeks *in limine* relief to include opposing party statements obtained from Hospital's employees and physicians during the deposition process.[2]

Last but not least, Angélica seeks *in limine* relief to exclude any mention to the jury of insurance policy limits.

The details follow below.

## II.    INCLUSIONARY *IN LIMINE* RELIEF

### A. THE EMERGENCY ROOM VIDEO

The Emergency Room Video contains the following statements:

> Greetings and thanks for choosing the Mennonite Health System as your hospital.
>
> We know that there are options when deciding on a health provider, so we take this opportunity to reiterate our gratitude for being part of the Mennonite Health System family.
>
> Nobody really likes to wait. Our time is the most precious value and we want to do everything right away. However, in the Mennonite Health System and in this case, in our emergency rooms, your health is not taken lightly.
>
> When we are sick, we want to receive health services as quickly as possible. However, sometimes, when visiting an emergency room, we feel we spend more time in it than we want to.
>
> In the Mennonite Health System, we want you to be oriented, so we share with you some of the processes that could contribute to extending the time you wait in our emergency rooms.
>
> You look for, and above all you deserve, high quality services and confidence in the processes we carry out. This requires that our work team take the necessary time to ensure that it is offering the right treatment for you and for each of our patients.

---

[2] The deposition testimony was memorialized by video. Angélica intends to use portions of some deposition videos during opening statements. She intends to do the same if the need arises for impeachment purposes and closing statements.

Our goal is to serve you with excellence and to make zero mistakes, so we take the time and thought process necessary to each procedure very seriously.

In the Mennonite Health System we work hard to make your stay in the room as short as possible. However, there are several factors that can influence an extension on your waiting time. What are some of these? The doctor will probably order you to have a laboratory test or x-ray to identify your health condition. If this is the case, for example, the laboratory equipment can take up to 3 hours to process a sample.

On the other hand, a patient who must be treated immediately because his life is in danger may arrive at our emergency room. In a case like this, we focus all our energy and resources on saving that human being, which could delay the care to other patients. Remember that we would do exactly the same for you.

In our emergency room each patient is unique and special. We give each one the warmest treatment and the most accurate treatment that will lead to the recovery of their health.

You're not alone. If you have any questions about the treatment process or the waiting time in the Emergency Room, do not hesitate to ask the patient associate or any of our employees. Everyone is available to provide you support during your time in our emergency room.

Thanks again for being part of the Mennonite Health System and remember, your health is not taken lightly.

Certified English Translation of video; **Exhibit I**.[3]

The Emergency Room Video constitutes relevant evidence under FED. R. EVID. 401 & 402. The video also constitutes an opposing party statement admissible under FED. R. EVID. 801(d)(2)(B)-(D).

---

[3] A copy of the video with the closed captions containing the certified English translation may be downloaded from the following link:

https://www.dropbox.com/s/ot2y9xzq41hu4o2/SSM%20Tu%20Salud%20No%20Se%20Toma%20a%20la%20Ligera%20Subtitle.mp4?dl=0

### i.    *The emergency room video is relevant*

For judicial purposes, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401; see also United States v. Maldonado–Garcia, 446 F.3d 227 (1st Cir.2006). Relevant evidence is that which "tend[s] to prove the matter sought to be proved []." FED. R. EVID. 401 advisory committee's note.

There is a presumption that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.") FED. R. EVID. 402; see also United States v. Mora, 81 F.3d 781, 783 (8th Cir.1996) ("Relevance of evidence 'is established by any showing, however slight, that [the evidence] makes it more or less likely that the defendant committed the crime in question.'") (quoting United States v. Casares–Cardenas, 14 F.3d 1283, 1287 (8th Cir.1994), cert. denied, 513 U.S. 849 (1994)).

In conjunction, "[r]ules 401 and 402 establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules provide otherwise." Huddleston v. U.S., 485 U.S. 681, 687 (1988). In the First Circuit, District Courts "enjoy wide latitude in passing upon the relevance of evidence." Maldonado–Garcia, 446 F.3d at 231 (citing United States v. Norton, 26 F.3d 240, 243 (1st Cir.1991)).

In this case, the Emergency Room Video is relevant for at least **two** reasons.

**First**, the Video is an institutional communication addressed at the patients who visit the emergency rooms of the Mennonite Health System.  See **Exhibit I**. As the video shows, the Hospital and its Emergency Room are part of the Mennonite Health System. Id. The statements contained in the Video, therefore, apply to the Hospital and its Emergency Room.

**Second**, the Video sets forth the Hospital's expectations, goals, vision and mission for the services offer to each person who visit its Emergency Room.

Among other things, the Video states that Emergency Room patients (i) should be treated like family; (ii) deserve high quality services; (iii) ought to receive services from the Hospital's multidisciplinary working team; and (iv) be allocated the necessary amount of time to secure the right treatment. See **Exhibit I**.

 The Video also discusses the Hospital's goals for the services it provides to Emergency Room patients: "Our goal is to serve you with excellence and to make zero mistakes, so we take the time and thought process necessary to each procedure very seriously." Id.

Likewise, the Video sets forth the Hospital's vision and mission statement for its Emergency Room patients: "In our emergency room each patient is unique and special. We give each one the warmest treatment and the most accurate treatment that will lead to the recovery of their health." Id.

Furthermore, the Video delineates the course of action available to patients when assistance is in order to address treatment needs that may arise in the Hospital's Emergency Room:

> You're not alone. If you have any questions about the treatment process or the waiting time in the Emergency Room, do not

> hesitate to ask the patient associate or any of our employees
> Everyone is available to provide you support during your time
> in our emergency room.

Id.

It is beyond peradventure that the Emergency Room Video has a tendency to make more probable than not the fact that the Hospital and its personnel incurred in the negligent actions and omissions alleged in the Complaint. Indeed, as stated above, the Video delineates several Hospital benchmarks for the services offered at its Emergency Room against which to compare the services and treatment Angélica received during her visits in September 2016. The comparison between those benchmarks *vis a vis* the actions and omissions that took place in this case is not only consequential, it is front and center in the controversies to be adjudged by the jury.

### *ii.    The Emergency Room Video constitutes and opposing party statement*

The Emergency Room Video constitutes an opposing party statement under Fed. R. Evid. 801(d)(2)(B)(C) & (D).

In pertinent parts, Fed. R. Evid. 801(d)(2) reads as follows:

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

  **(2)** *An Opposing Party's Statement.* The statement is offered against an opposing party and:

    **....**

    **(B)** is one the party manifested that it adopted or believed to be true;

    **(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed

(emphasis in original).

In this case, as relevant for the subsection (B) analysis, the Emergency Room Video was made and posted on youtube in 2015 with the authorization of personnel from the Mennonite Health System. See Answers to Request for Admissions, pgs. 4-5, ¶¶ 2-3; **Exhibit II**. In fact, today, the video remains posted in youtube with the knowledge and acquiescence of that same personnel. Id., at pgs. 5-6, ¶¶ 4-5.

Having authorized the making of the Video and its posting in youtube, it is irrefutable that the Mennonite Health System believes its content to be true. The Video therefore qualifies as an adoptive admission under FED. R. EVID. 801(d)(2)(B). See, c.f., Kirksey v. Schindler Elevator Corporation, Civ. No. 15-0115-WS-N, 2016 WL 7116223, *8-9 (S.D. Aa. Dec. 6, 2016) (finding determinant for purposes of FED. R. EVID. 801(d)(2)(B) that video had been prepared with significant support of the party against whom it was offered)); see also, Spurlock v. Fox, Civ. No. 3:09-cv-0756, 2010 WL 3807167, *8-9 (M.D. Tenn. Sept. 23, 2010) (applying FED. R. EVID. 801(d)(2)(B) to memo copied and distributed around by party against whom it was offered); Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., 262 F. Supp. 2nd 251, 259-60 (S.D.N.Y. 2003) (collecting cases of adoptive admissions and adoption by silence).

Moving on to subsection (C) of FED. R. EVID. 801(d)(2), the Emergency Room Video was made by a third party, with the expressed authorization of personnel from the Mennonite Health System. See **Exhibit II**, 4-5, ¶¶ 2-3. The Video

therefore also falls squarely within the ambits of subsection (C). See, e.g., Reid Bros. Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1306–07 (9th Cir. 1983), cert. denied, 464 U.S. 916 (1983) (holding that publication written and distributed with party's authorization fall within FED. R. EVID. 801(d)(2)(C)); Penguin Books, 262 F. Supp. 2d at 260 ("The relevant inquiry in FED. R. EVID. 801(d)(2)(C) situations is whether the person making the statements had the authority to speak on a particular subject on behalf of the party the admission is to be used against.") (citing 30B Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE EVIDENCE, § 7022 (Interm ed. 2002)).

Lastly, in connection with subsection (D) of FED. R. EVID. 801(d)(2), in making the Emergency Room Video, the third party retained for that purpose endeavored as Mennonite's agent, and the statements in the Video are without a doubt made within the scope of that agency relationship—that is, the making of the video. See Penguin Books, 262 F. Supp. 2d at 262 (ruling FED. R. EVID. 801(d)(2)(D) applicable to statements made in book written by agent of corporate party against which the statements were offered); Bostick Oil Co., Inc. v. Michelin Tire Corp., 702 F.2d 1207, 1221 (4th Cir. 1983) (noting that memorandum which is written by agent with authorization of party against whom it is to be offered falls within FED. R. EVID. 801(d)(2)(D)).

To boot, as discussed above, the Emergency Room Video constitutes relevant and admissible evidence under FED. R. EVID. 401, 402 and 801(d)(2)(B)(C) & (D).

**B. THE "LIVING THE MENNONITE EXPERIENCE" VIDEO**

The Living the Mennonite Experience Video (the "Mennonite Experience Video") shows the Hospital's CEO making the following remarks:

> Hi!
>
> It is a pleasure to greet you and to welcome you to live the Mennonite experience.
>
> All of us at the Mennonite Health System must do so with a purpose, to offer services with the highest standards of quality and safety. Our organization is made up of resources like you, highly qualified in the different areas in which they work, and that are committed to the health and well-being of our patients.
>
> It is for this reason that we constantly strive to continue cultivating the best people. The best talent to take our system to another level.
>
> Just as we provide educational opportunities today, a few years ago, I had the opportunity to attend a workshop offered at the Walt Disney amusement park. In it I could observe behind the scenes how they valued their most important resource, employees. The ones who make that place a magical one. After that experience, I came back excited and eager to promote the principle of making the Mennonite experience come live.
>
> Our magic has to be, to make our patients live an experience of full delight. To achieve this, each of us has to live and be part of the Mennonite experience. People vacation at Disney to create memories that they will carry in their hearts all their lives. In our case, if the memory that our patients keep is that they received quality and safe services, offered by dedicated and attentive co-workers to their physical, emotional and spiritual needs, we have undoubtedly reached our goal.
>
> Said workshop, which was organized by a group of colleagues, has as its central theme, compassion and ensuring that each day, every time we serve, our mission becomes a reality. It fills me with joy to see how that idea that God put in my heart, today grows and strengthens and is a source of blessings for you and our patients. Participating in this workshop will allow you to put yourself in the patient's shoes, to look through their eyes and develop new strategies so that everything you do is a reflection of a service offered with compassion and Christian love.

As the executive director of this noble and great system, I hope you are certain that my colleagues, physicians, volunteers, are our most precious resource. I trust that this experience we will live today will be a great blessing and will renew our energy to work together, in harmony, in order to honor our mission. Offering excellent services with Christian love. Live and bring to life the Mennonite experience.

God bless you!

Certified English Translation of video; **Exhibit III**.[4]

The Mennonite Experience Video constitutes relevant evidence under FED. R. EVID. 401 & 402. The Video also constitutes an opposing party statement admissible under FED. R. EVID. 801(d)(2)(D).

### i.    *The Mennonite Experience Video is relevant*

The Mennonite Experience Video is relevant as it sets forth Hospital's expectations, goals, vision and mission for the services its employees provide. The Video, for example, makes plain that all Hospital employees (i) must strive "to offer services with the highest standards of quality and safety"; (ii) should be "committed to the health and well-being of our patients" and "to make our patients live an experience of full delight"; and (iii) should step into "the patient's shoes, to look through their eyes" and offer services "with compassion and Christian love." **Exhibit III**. The Mennonite Experience Video also makes plain that each day, every time services are provided, the Hospital's mission and central theme of compassion and excellence must come alive. Id.

---

[4] A copy of the video with the closed captions containing the certified English translation may be downloaded from the following link:

https://www.dropbox.com/s/l3gslnhprhegi6d/Vive%20La%20Experiencia%20Menonita%20Subtitle.mp4?dl=0

Just as the Emergency Room Video, the Mennonite Experience Video sets forth benchmarks for the services offered by Hospital employees against which to compare the services and treatment Angélica received during her visits in September 2016. Those benchmarks provide some of the base against which the jury is to assess the negligent actions and omissions that took place in Angélica's case. The FED. R. EVID. 401 relevancy threshold is therefore met.

### ii.    The Mennonite Experience Video constitutes an opposing party statement

Here, the analysis begins and ends with FED. R. EVID. 801(d)(2)(C) and (D). The Hospital's CEO is the only speaker that appears in the Video, and he does so in his capacity as CEO. See **Exhibit III**. It is also irrefutable that the CEO's remarks set and disseminate institutional goals and expectations as to the quality of services its employees provide. Id. Those remarks revolve around obligations traditionally ascribed to a CEO's managerial post.

Under similar circumstances, courts around the nation routinely find FED. R. EVID. 801(d)(2)(C) and (D) applicable. See, e.g., Fischer v. Forestwood Co., Inc., 525 F.3d 972, 984 (10th Cir. 2008) ("[a]s president, he was 'authorized' by Forestwood 'to make a statement concerning' hiring and firing") (citing FED. R. EVID. 801(d)(2)(C)); Schweitzer v. Teamster Local 100, 413 F.3d 533, 538 (6th Cir. 2005) ("reasonable to surmise that a Secretary-Treasurer of a union has the authority to make a statement on behalf of the union" under FED. R. EVID. 801(d)(2)(C)"); see also Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995) (discussing FED. R. EVID. 801(d)(2)(D)); Penguin Books, 262 F. Supp. 2d at 261 (citing caselaw for the well-settled principle that "statements by

company officers within the realm of that officer's responsibility and during the existence of the relationship **constitute an admission by the employer.**"). The same holding is warranted here.

### C. ZERO ERROR POLICY VIDEO

The Zero Errors Video depicts the Hospital's CEO speaking about the Hospital's culture for quality and its goal to serve with zero errors at all levels and by all employees. Specifically, the CEO's remarks in the Zero Error Video are the following:

> This has been an extremely valuable effort because of the teamwork among employees, from the Board of Directors to at all levels, along with the Medical Faculty, to achieve these results. The most important element is to have achieved an impact of "the quality culture" in all levels of the Hospital. Every employee, no matter what level, should know that their work is so important that it has to be done with zero errors because, as long as it is done well, it affects others in the service chain. There is no way of doing things well. To get economic benefits for the institution and benefits to patients, you have to be focused on quality.

Certified English Translation of video; **Exhibit IV**. [5]

This video is relevant and admissible for the same reasons and under the same authorities discussed above in connection with the Mennonite Experience Video. That argumentation and those authorities are incorporated here by reference to avoid unnecessary repetition.

---

[5] A copy of the video with the closed captions containing the certified English translation may be downloaded from the following link:

https://www.youtube.com/watch?v=mHTxdkA2CWE

The relevant portion of the video begins at minute 3:29 and ends at minute 4:15.

### D. DEPOSITIONS TESTIMONY AS OPPOSING PARTY STATEMENTS

Angélica also seeks to admit as substantive evidence under FED. R. EVID. 801(d)(2)(d) deposition testimony proffered by a managerial employee of the Hospital, two of its nurses and two of its physicians regarding adjudicative facts.

"It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility.'" Globe Savings Bank, FSB v. United States, 61 Fed. Cl. 91, 96-97 (2004) (quoting Aliotta v. National R.R. Passenger Corp., 315 F.3d 756, 761 (7th Cir.2003); see also, Creative Consumer Concepts, Inc. v. Kreisler, 563 F.3d 1070, 1080 (10th Cir. 2009) (noting that FED. R. CIV. P. 32 allows a party to introduce as a part of its substantive proof, the deposition of its adversary, and it is immaterial that the adversary is available to testify at trial or has testified there).

The first threshold to satisfy for admission is that the deposition testimony revolves around a matter within the scope of the agency or employment relationship. FED. R. EVID. 801(d)(2)(D).    The second, is that deposition statements be given "during the existence of that relationship. Id.

Both of those requirements are met here in connection with the above-mentioned deposition testimony.

The deposition testimony at issue exclusively revolves around the treatment provided to Angélica at the Hospital's Emergency Room and the circumstances and considerations underlying that treatment. The testimony therefore exclusively revolves around matters within the scope of the employment or agency of the deponents. See, e.g., Glove Savings, 61 Fed. Cl. 96-97 (admitting

as substantive evidence deposition testimony given by an employee of opposing party); In re Hayes Lemmerz Int'l. Inc., 340 B.R. 461, 468-69 (Bankr. D. Del. 2006) (same).

Likewise, the professional relationship between the Hospital and the deponents was in place when the deposition testimony was given. Indeed, still today, all the deponents continue to work at the Hospital. Hence, the depositions were given during the existence of the deponents' relationship with the Hospital. See, e.g., U.S. v. Saks, 964 F.2d 1514, 1524-25 (5th Cir. 1992) (admitting deposition testimony given while partnership was still in existence).

The specific deposition testimony Angélica seeks to admit as substantive evidence follows below.

### i. Deposition of the Administrative Director of the Hospital's Emergency Room

Angélica seeks to admit as substantive evidence statement from the Director of the Hospital's Emergency Room as to the following (i) the procedure applicable when a patient returns to the Emergency Room after having been released the same day; (ii) EMTALA violations in this case; and (iii) the Hospital's zero error policy and mishaps in this case. The statements follow next.

### a. Statements about procedure applicable when a patient returns to the Emergency Room after having been released the same day

A. Yes, I remember that according to the document that she left the Emergency Room, and she came back. She was.... I do not know if it was 20 or 25 minutes, and then she came back to the Emergency Room.

Q. The Complaint also states that when she came back she was not screened or stabilized before being released, correct?

ATTY. MARRERO: Asked and answered. You may respond.

A. I do not remember, but if she came back, she was supposed to have had her vital signs taken again, and she should have had her pain evaluated again by a doctor.

Q. And what do you mean by that?

A. Well, if she left the hospital because she had already been discharged and she is on the grounds of our institution, and if she started having pain again, the nurse has to take her vital signs again, get her complaint, and she has to be evaluated by the physician again.

Q. And where do you get that? Strike that. And where is that established at Menonita? Is that part of policies, rules, procedures, norms 18 or protocols at Menonita? Where do you get that from?

ATTY. MARRERO: Objection to form. You may respond.

A. Eh, we have, I have not seen where it says that, but we do have at the Hospital that if a patient returns, the patient is received and even the same record of the patient is used.

Q. And that is something generally known at Menonita at the Emergency Room?

A. Yes, yes.

Q. The nurses and all know that?

A. Yes.

Q. The doctors know it?

A. Yes.

Q. Would the medical record show whether a patient was seen by a doctor when she came back?

A. Yes. If they intervened there has to be some documentation by the physician.

Q. And what about the nurses, if they intervened with the patient, would there have to be something in the record too?

A. There would also have to be documentation by the nurse.

Q. Is that a requirement at Menonita?

A. Yes.

Q. A requirement known by doctors and the nurses, correct?

A. Correct.

Q. And is it also a requirement that every intervention with a patient or evaluation with a patient is recorded in the medical record as well?

A. That is correct.

Mr. Noel Vázquez' Deposition Transcript, p. 14, l. 1 to p. 16, l. 3; **Exhibit V**.

### b.   Statements Regarding EMTALA Violations

Q. There is nothing regarding the care Ms. Gonzalez received at Menonita after she came back, right? After she returned after 2:01 PM.

A. Yes. According to the document there is not.

Q. And according to the document her discharge was revoked at two forty- something in the afternoon, right?

A. Yes, yes.

Q. Let me, can you provide the document back to me, to attorney Marrero. You said that you are familiar with EMTALA's reporting requirements, right?

A. Yes.

Q. And you are familiar with EMTALA as well, right?

A. Correct.

Q. And you know that EMTALA requires patients who are at the ER to be screened by a physician, right? A. That is correct.

Q. And you know that a patient at the ER cannot be released without a screening by a doctor, correct?

A. That is correct.

Q. And you know that Ms. Gonzalez was released from the ER since you just reviewed the documents without a doctor screening her?

LAFFITTE: Objection. Go ahead, answer.

A. That is correct.

Q. And since you know EMTALA you know that is an EMTALA violation, correct?

LAFFITTE: Objection.
 ATTY. MARRERO: Objection, requesting an opinion of a witness. You may answer.

Q. And since you know that is an EMTALA violation? Correct?

A. That is correct.

Q. And nobody at Menonita has been reprimanded for that? Right?

MARRERO:
Objection to form, and scope and requesting an opinion of a witness. You can answer.

A. I have no knowledge at least on my part, no action has been taken against any nursing personnel that committed negligence. As far as physicians are concerned, I do not know.

Q. From your experience as a nurse of 14 years at Menonita and now as an ER Director since 2012, are there disciplinary measures needed in this case regarding the nursing care provided to Ms. Gonzalez back in 9 September 23, 2016?

MARRERO: Objection to the form, to the scope and asking an opinion of a fact witness.

A. Yes.

Q. Yes. What?

A. Disciplinary measures.

Q. Why?

ATTY. MARRERO: Same objection.

A. Well in the case of nursing, we have to proceed with a written
    warning to the file.

Q. To whom?

ATTY. MARRERO: Same objection.

A. To the nurse who took back the patient, who did not follow the 2
    protocol as it was in the Emergency Room.

Id., at p. 66, l. 10 to p. 69, l. 2.

### c. Statements about Zero Error Policy and Mishaps in this case

Q. alright. And the video talks about "Zero Errors". A policy
    regarding zero errors. Did you hear that?

 A. Yes.

Q. What is that policy?

ATTY. MARRERO: Objection, out of the scope of the deposition.
Objection to form. You may answer.

A. I do not know the zero error policy, but I part from the nature of
    services, it should be without error.

Q. So you have never seen a written policy regarding Zero Error?

ATTY. MARRERO:  Asked and answered.

A. Because I don't have to see the policy. Because I know that you
    have to work with zero errors.

Q. Alright. So, is that an institutional commitment at Menonita?

A. That is an institutional commitment.

Q. And what does it entail?

ATTY. LAFFITTE:
Asked and answered.

A. To be concentrated, focused on the service that we are going to provide to each patient that comes into the Emergency Room, focused on each process, in every action that the nurse and the physician are going to carry out with that patient.

Q. And from your review of the record of Ms. Gonzalez, did that happen here?

ATTY. MARRERO: Objection to form, objection to scope. Asking an opinion of a fact witness. He is not an expert witness in this case.

ATTY. LAFFITTE: I join in the objection.

Q. And I think perhaps there something is correct about the objection, but I am talking of your perception regarding the services provided by the nurses at the ER and the services that you as Director supervise?

ATTY. MARRERO: I maintain the objection exactly as previously. Objection to form, to scope. Asking an opinion of a fact witness and he is not an expert witness in this case. You can answer.

A. My perception is that in some aspects the process was not followed.

Q. And the video also mentions that employees at Menonita take the necessary time to ensure that the treatment provided to the patient is the correct one. You heard that, right?

A. Yes. That is correct.

Q. And from seeing the record and from your perspective as the ER Director did that happen in this case?

ATTY. MARRERO: I have an objection to the form, objection to scope. Asking an opinion of a fact witness. He is not an expert witness in this case.

Q. You may answer.

ATTY. LAFFITTE: The same objection.

A. Again I repeat according to what is documented, in some aspects the correct thing was not done.

Id., at p. 102, l. 5 to p. 104, l. 14.

### ii. *Deposition of Emergency Room Nurse who revoked Angélica's discharge at 2:30 pm on September 23, 2016*

As to this deponent, Angélica seeks to admit into evidence statements about (i) the nurse's obligations under EMTALA; and (ii) medical care provided to Angélica after her discharge was revoked on September 23, 2016. The statements are bellow.

### a.    Nurse's obligations under EMTALA

Q. So, every year you take EMTALA training? Is that what you are saying?

A. That is correct. From the manual that is there.

Q. Would that have been the case since 2012 to date?

A. That is correct.

Q. And what is discussed in those EMTALA trainings?

A. The law is discussed, that the law protects the patient. The patient's rights to services, to be attended to, that.

Q. What are those rights?

A. Those rights of the EMTALA law are the right to receive services, regardless of the person's ability to pay, guarantee service and care to the patient, until they are dispositioned or transferred.

Q. So, anything else you have to do, sir? So, when you a get a patient in the Emergency Room, as a nurse, what are your duties in order to comply with EMTALA?

ATTY. MARRERO: I have an objection to the form, but he can answer.

A. Ehh, my duties are from the time that the patient arrives, the patient is screened, that the patient should be seen by the physician, evaluated by the physician, and then to be handled and attended to by the nursing staff.

Q. So according to you as a nurse you make sure that the doctor knows that there is a patient to be seen? For EMTALA to be complied with?

ATTY. MARRERO: I have an objection, that is not what the witness just testified to, but he can answer.

Q. So the nurse has the duty to tell the doctor there is a patient at the ER that the doctor needs to see?

A. That is correct.

Q. And that is according to your obligations as a nurse under EMTALA law.

A. Yes, which is to handle the patient and to provide the service.

Q. And to alert the doctor that a patient is there that requires medical attention.

ATTY. MARRERO: Asked and answered.

A. Yes.

Deposition of Mr. Johnny Adames, p. 42. l. 1 to p. 43, l. 16; **Exhibit VI.**

### b.  **Statements about medical care provided to Angélica after her discharge was revoked on September 23, 2016**

Q. So what medical treatment -- do you remember what was your shift back on September 23, 2016?

A. According to what I see in the note, from 7am to 7pm.

Q. Okay, and during your shift, since you were the one that revoked Ms. Gonzalez's discharge, is it fair to say that you were the nurse in charge of her nursing care while she was in the E.R.?

A. During the time frame that she was under my care from 10:45, more or less 10:45 to 7:00 pm.

Q. And during..., after 14:30 until 19:00, which is 7:00 pm, do you remember what doctor, if any, examined Ms. Gonzalez?

A. I don't remember at the moment.

Q. Is that stated somewhere in the record? The record you have in front of you?

A. I have no other entries of any order.

Q. What medical treatments did Ms. Gonzalez receive from 14:30 to 19:00 on September 23, 2016?

A. According to the orders, there is no treatment ordered.

Q. And what medication was she given from 14:30 until 19:00?

A. There are no orders entered by any physician at that time.

Q. And between 14:30 and 19:00, how many times did you examine Ms. Gonzalez?

A. On one occasion, on the occasion that I put her to bed and one time before the hand off of the shift. Because you always do that round to verify before the hand off.

Q. So, you wrote her discharge, and you evaluated her and you wrote this revocation note, correct?

A. I wrote the note that I returned her to the Emergency Room.

Q. And that's what you're referring to when you said you evaluated her one time, at first, when she came to the Emergency Room?

A. No, no, exactly that is one of my second interventions with her. Because she was received, she was received, the round was made, when I went to discharge her that her vital signs were taken, and then I handled her when, it's in the notes, when she returned and then when the patient was handed off.

Q. Okay, but all I want to know is, between 14:30, not counting that intervention, and 19:00, not counting that intervention

either, how many times, in the middle, in between, did you examine Ms. Gonzalez?

A. I have no written note about any intervention.

Q. So for four and a half hours, and that's the time that transpired between 14:30 and 19:00, there is no indication that you examined Ms. Gonzalez, correct?

ATTY MARRERO: Asked and answered.

A. That's correct.

Q. And there's no indication either that between that time ....let's strike that, there's no indication either that for those four and a half hours a doctor examined Ms. Gonzalez?

A. That's correct.

Id., at p. 111, l. 2 to p. 113, l. 5.

### iii.  Deposition of Emergency Room Nurse who discharged Angélica home at 8:00 pm on September 23, 2016

The statements from this deponent that Angélica seeks to admit into evidence are concerning (i) failures to notify a physician about Angélica's symptoms; and (ii) the medical treatment provided to Angélica from 7:00 pm until her release from the Hospital at 8:00 pm on September 23, 2016. The pertinent statements are next.

#### a. Statements about failures to notify a doctor about Angélica's symptoms

ATTY RODRIGUEZ: Did you tell a doctor that Ms. Angélica was limited in her movements?

DEPONENT: No.

ATTY. RODRIGUEZ: Didn't you have a duty to tell a doctor that her movements were limited?

DEPONENT: Yes.

ATTY. RODRIGUEZ: But you didn't tell a doctor?

DEPONENT: No.

ATTY. RODRIGUEZ: Why?

DEPONENT: I don't recall.

ATTY. RODRIGUEZ: And when you wrote "pain intensity moderate 5", what did you mean by that?

DEPONENT: She referred to me that she had a number 5.

ATTY. RODRIGUEZ: Do you actually remember her referring to you that she had a number 5?

DEPONENT: Well I documented it.

ATTY. RODRIGUEZ: So what you are telling me now is based on that note?

DEPONENT: That's correct because I don't remember the event.

ATTY. RODRIGUEZ: Fair enough. And the location of her pain was her back, according to the note?

DEPONENT: That's correct.

ATTY. RODRIGUEZ: Did you tell any doctor that Ms. Gonzalez had pain in her back?

DEPONENT: No.

ATTY. RODRIGUEZ: Did you have a duty to tell a doctor that she had pain in her back?

DEPONENT: Yes

ATTY. RODRIGUEZ: And why didn't you tell a doctor?

DEPONENT: I really don't remember whether or not I did say it, because I don't remember the episode.

ATTY. RODRIGUEZ: Is that annotated somewhere in the medical record?

DEPONENT: No.

ATTY. RODRIGUEZ: So the record doesn't contain any notes written by you stating that you discussed with a doctor about Ms. Angelica's evaluation?

DEPONENT: No.

Ms. Yoliris Vázquez's Deposition Transcript, p. 59, l. 1 to p. 61, l. 5; **Exhibit VII**.

> **b. Statements about medical care provided to Angélica on September 23, 2016, between 7:00 pm and her release at 8:00 pm**

ATTY. RODRIGUEZ: And you began your shift at 1900, that's 7:00 pm and Ms. Gonzalez was released an hour later, at 8:00 pm, correct?

DEPONENT: That's correct.

ATTY. RODRIGUEZ: And tell me what doctor examined Ms. Angelica between 7:00 pm and 8:00 pm?

DEPONENT: Well, Dr. Hernandez had the case.

ATTY. RODRIGUEZ: We are going to get to that, but I'd like you to answer the question, so what doctor examined Ms. Gonzalez between 7:00 pm and 8:00 pm?

DEPONENT: I don't recall.

ATTY. RODRIGUEZ: But is that stated somewhere in the record?

DEPONENT: No
ATTY. RODRIGUEZ: So according to the record, no doctor examined Ms. Gonzalez between 7pm and 8pm?

DEPONENT: No

ATTY. RODRIGUEZ: And what do you mean by Dr. Hernandez had the case? What do you mean by that?

DEPONENT: He was the one who was gonna follow up with her.

ATTY. RODRIGUEZ: And where do you get that from the medical record?

DEPONENT: No, it's not there.

ATTY. RODRIGUEZ: And where do you get that recollection from? Because you said that you don't recall anything from September 23, 2016, is that correct?

DEPONENT: That is not correct, I don't recall.

ATTY. RODRIGUEZ: How can you say that Dr. Hernandez had the case, if that is not indicated in the medical record?

DEPONENT: Well Dr. Marmolejo evaluated her before and he left the case to Dr. Hernandez.

ATTY. RODRIGUEZ: And that was at 6:33 am in the morning, right?

DEPONENT: That's correct.

ATTY. RODRIGUEZ: So after that time, actually let me strike that. So, after that 10:03 am regarding Dr. Hernandez providing morphine to the patient, Ms. Gonzalez, is there any indication on the record that Dr. Hernandez provided medical treatment to Ms. Gonzalez after 10:03?

DEPONENT: The Venous Doppler.

ATTY. RODRIGUEZ: And at what time was that venous doppler?

DEPONENT: At 10:03 in the morning.

ATTY. RODRIGUEZ: My question again is, after 10:03 in the morning, is there any other annotation in the medical record indicating that Dr. Hernendez examined Ms. Gonzalez?
DEPONENT: No, at that time the study and the morphine.

ATTY. RODRIGUEZ: But again, after that time, is there any other indication in the medical record that Dr. Hernandez saw Ms. Angelica? provided care?

DEPONENT: No.

ATTY. RODRIGUEZ: So when you wrote the chart comments there was no indication in the medical record to conclude that Dr.

Hernandez Junior had seen Ms. Gonzalez and had provided a medical discharge?

DEPONENT: No.

ATTY. RODRIGUEZ: And the only discharge comments that were made in record were made at 14:01 in the afternoon?

DEPONENT: That's correct.

ATTY. RODRIGUEZ: And we don't know who made those comments.

DEPONENT: That's correct.

ATTY. RODRIGUEZ: Okay. What medication was Ms. Gonzalez given between 7:00 am, I mean 7:00 pm and 8:00 pm before the discharge?

DEPONENT: None.

Id., at p. 67, l. 9 to p. 70, l. 6.

### iv. Deposition of Emergency Room physician who tended to Angélica in the morning of September 23, 2016

The statements from this deponent that Angélica seeks to admit are about (i) the presentation of cauda equina syndrome symptoms; (ii) MRI testing being the gold standard to diagnose cauda equina syndrome; (iii) Hospital policies precluding the use of MRI equipment for Emergency Room patients; and (iv) lack of discharge instructions for Angélica's discharge at 8:00 pm on September 23, 2016. Below are the relevant statements.

### a. Statements about the presentation of cauda equina syndrome symptoms

Q: Okay. So tell me all the symptoms of cauda equina syndrome.

ATTY. DIEPPA: Asked and answered.

A: What the symptoms are?

Q: All of the symptoms.

ATTY. DIEPPA: Objection to form.

Q: You may answer.

A: A patient that comes in with strong back pain, loss of sensitivity in one the legs, and some neurological, and some sensitivity, loss of sensitivity in the perineal anal area. Yes. Problems urinating or with bowel movements.

Q: What else?

A: That is basically it.

Q: You mentioned earlier that the back pain can radiate to the legs, did I hear you right?

A: That could happen, yes.

Q: Is that also a symptom of cauda equina syndrome?

A: It could be present.

Q: So, it is or it could be? Which one it is?

ATTY. DIEPPA: Asked and answered.

Q: The response is it could be or it is a symptom of cauda equina syndrome?

A: It is part, yes.

Q: So, it is a symptom?

A: Those are the symptoms of cauda equina, yes.

Q: Yes, take advantage of the translator. Is there any other symptom? Have you listed all of the symptoms?

A: Well, the basic symptoms in my knowledge, those are the symptoms.

Dr. Victor Hernández' Deposition Transcript, p. 11, l. 1 to p. 12, l. 7; **Exhibit VIII**.

### b. Statements about MRI being the gold standard to diagnose cauda equina syndrome

Q: So, I ask you why is it the gold standard? Can you begin your response again? Why an MRI is the gold standard to diagnose cauda equina syndrome?

A: Because based on my knowledge it is the best study that can pin point whether that patient has a compression that is causing cauda equina.

Q: And a CT Scan will not allow you to see whether there is a compression in the cauda equina, correct?

ATTY. MARRERO: Objection to form.

ATTY. DIEPPA: Objection to form.

Q: You may answer.

A: It could be but, we can't rule it out with a CT Scan.

Q: So to rule out cauda equina you need an MRI?

A: If we have symptoms that concern us, along with the patient's clinical evaluations then we have to do an MRI.

Q: Cause the MRI is the only way to rule out cauda equina syndrome, or confirm cauda equina syndrome?

ATTY. DIEPPA: Objection to form.

Q: Let me pose that question again. An MRI is the only study that you could use to confirm that a patient has cauda equina.?

ATTY. MARRERO: Objection to form and to the question.

ATTY. DIEPPA: Objection to form.

Q: You may answer.

A: Okay. If we have the clinical symptoms and so forth, the MRI is the only study that will rule it out.

Q: Is there any other study that would rule it out?

A: No.

Id., at p. 14, l. 10 to p. 15, l. 19.

### c. Statements regarding Hospital policy prohibiting use of MRI equipment for Emergency Room patients

Q: So, Menonita doesn't have MRI services? Is that what you are saying?

A: No.

Q: No?

A: Not in the Emergency Room at that time.

Q: What do you mean by that?

A: That we don't have MRI services in the Emergency Room. Q: On what moment?

A: No, no, at that moment, at that time. Q: And what moment are you referring about?

A: No, what I am saying is that we don't have it.

Q: So, today you don't have MRI capability at Menonita?

ATTY. DIEPPA: Objection to the question, misleading.

ATTY. MARRERO: Objection.

A: Hospitalized yes, but in the Emergency Room we are not allowed, or at least I am not allowed to order an MRI.

Q: Why aren't you allowed?

ATTY. MARRERO: I have an objection to this line of questioning because it is totally speculative.

Q: Why aren't you allowed?

A: Because in the Emergency Room there are studies that can be done and others that cannot be done. It is not within the Emergency Room procedures.

Q: Are there MRI capabilities at Menonita?

ATTY. DIEPPA: Objection, that is beyond the scope of whatever the scope is.

ATTY. MARRERO: This is completely beyond the scope of the doctor's intervention in this case.

ATTY. RODRIGUEZ: Yeah, you may answer.

ATTY. DIEPPA: Specially as a witness.

Q: Are there MRI capabilities at Menonita?

A: There is an MRI.

Q: There is an MRI machine in Menonita, correct? A: Yes. Q: And you stated that at Menonita patients who are hospitalized are able to use the MRI equipment.

ATTY. DIEPPA: Objection to form.

A: I don't know exactly what the process is for hospitalized patients to have an MRI, but I do know that there is an MRI that is used for hospitalized patients.

Id., at p. 18, l. 1 to p. 20, l. 3.

Q: And I understood that perfectly fine. My question was not that. My question was different. My question is, if you have a patient in the ER who you suspect who has cauda equina, your testimony here today is that you are not able or allowed to use the MRI equipment at Menonita?

ATTY. DIEPPA: Objection.

ATTY. MARRERO: Objection. Misleading, beyond the scope.

Q: You may answer.

A: I directly cannot order an MRI. No.

Q: So, as an ER physician in Menonita you are not able to order MRI, is that what you are saying?

ATTY. MARRERO: Objection to the question. Misleading, beyond the scope of this deposition.

A: No. I would have to request authorization. No, not in that particular case.

Q: What authorization would you need to request?

ATTY. MARRERO: Objection to the question. Misleading, beyond the scope of this deposition. Asking an expert opinion of the doctor who is a witness in this case.

Q: What authorization would you need to request?

A: To the directors to see if an MRI can be done. I cannot order an MRI directly.

Q: When you say the directors, who are you referring to? The ER director?

ATTY. MARRERO: Objection to the question. Again, beyond the scope of this deposition.

A: I have to request authorization direction from the hospital director.

ATTY. DIEPPA: Utilization also, he used the word utilization.

INTERPRETER: Utilization?

A: Utilization.

Q: So if you get authorization then you would be allowed to use the MRI equipment at Menonita?

ATTY. DIEPPA: Objection.

ATTY. MARRERO: Objection to the question, completely beyond the scope of this deposition.

A: Yes.

Id., at p. 26, l. 16 to p. 28, l. 12.

**d. Statements denying having provided discharge instructions to the nurse who released Angélica at 8:00 pm of September 23, 2016**

Q: So, if you go to Bates stamp number 18. Are you there? What time was it when the last nursing note was entered?

ATTY. DIEPPA: Objection.

Q: According to the medical record.

A: What time was it entered?

Q: The last note, nursing note, what time was it when it was made?

ATTY. DIEPPA: Objection. Lack of foundation.

A: Nursing note. 19:00.

Q: Is there another note below that one? Is there a note at 20:00 hours?

ATTY. DIEPPA: On what page counsel?

Q: Oh, eighteen. Are you in nineteen or eighteen?

ATTY. DIEPPA: I am on nineteen.

Q: Okay, go to eighteen.

A: Where are you at doctor. Yes, you are in the right page, your attorney is not.

ATTY. DIEPPA: Yes, I am, it says Bates 18 here.

Q: Yeah, but that is not the one I am on.

A: Discharge time? Discharge time?

Q: Yes. What time was that?

A: Twenty.

Q: And what time is that?

A: Eight? No.

Q: Yeah, it is eight, cause you use military time in the record at the hospital, correct?

A: Yes, yes.

Q: And were you at the hospital at 8:00 PM?

A: No.

Q: And why not? Cause your shift? Was your shift still on?

A: My shift is until 4:00 P.M.

Q: Alright. So, if you go there to discharge comments, it says that you provided discharge comments at 8:00 PM at night. How could that be?

A: I have no answer for that.

Q: That is what is stated there, right?

A: Yes.

Q: A nurse discharged the patient because according to the nurse you told her.

A: No. To the best of my recollection, at four o'clock in the afternoon at the latest I am out of the hospital.

Q: But going to the record, below that 20:00 hour note it says that you provided discharge comments, right?

A: Where does it say that?

Q: The fourth line below twenty.

A: Discharge comment?

Q: Unhum. You are Dr. Hernandez Junior, right?

A: Yes. But that means comments at discharge, comments upon discharge. I don't know want that refers to.

Q: So, the way I interpreted this comment was that this nurse and the way she told me at her deposition was that you were the one who ordered her discharge at 20:00 hours.

A: I was not there.

Q: Do you know, do you have any evidence to prove that? A: My shift that day, the time that I was there.

Q: I am going to hand you the copy of the program for the ER. Go to the 23. Where you working that day at 8:00 PM?

A: Seven to three.

Q: So, that nurse probably was mistaken when she said that you ordered the discharge of the patient.

A: Yes.

Id., at p. 64, l. 11 to p. 67, l. 10.

> ### v.    *Deposition of Emergency Room physician who diagnosed a suspected cauda equina syndrome on September 27, 2016*

Lastly, Angélica seeks to admit statements from this deponent as to the importance of ruling out cauda equina syndrome before any other possible condition. The statements follow.

> #### a.   **Statements about the importance of ruling out cauda equina syndrome before any other possible condition**

Q. Okay. You mentioned several times that you tried to rule out Cauda Equina, right?

MR. RUIZ:
Objection.

MS. MARRERO:
Objection, that's not what he stated.

MR. RODRÍGUEZ:
Q. What did you state?
A. That was my primary diagnosis.

Q. Because you have to rule out.

A. I don't have to rule out, I was pretty certain that that's was the diagnosis.

Q. So when you examine a patient do you, do you rule out other conditions?

A. I have the patient with the symptoms that I saw the patient. I think that my top of my list of this patient is a neurosurgical emergency and that's why I need to transfer my patient because she had a neurosurgical emergency. She has been with it.

Q. And why would that, a neurosurgical emergency?

A. Because it's a, like you previously said it's a Cauda Equina Syndrome.

Q. And what is it, why is that a neurosurgical emergency?

A. Because it's concerns compression of the, of the spinal cord.

Q. So, what you are saying is that when you examined Angélica you didn't perform a differential exam?

MR. RUIZ:
Objection to the form of the question, you can answer.

DEPONENT:
I performed a differential exam but the most that, from the differential exam could be more, less severe conditions and pursuing less severe conditions could harm the patient. I think the more severe condition that you could, she could be having would be that and my hospital doesn't have the capabilities to treat that condition.

MR. RODRÍGUEZ:
Q. So if I understand to paraphrase what you said so when you examine a patient you rule out first the most dangerous conditions.

A. In my experience that's why I work.

Dr. Orlando Rivera's Deposition Transcript, p. 272, l.17 to p. 274 l. 9; **Exhibit IX**.

## III.    EXCLUSIONARY IN LIMINE RELIEF

This Honorable Court should preclude any attempt by codefendants to mention or in other way let the jury know about the limits of the insurance policies available to them.   In this case, there are no controversies to adjudge regarding policy limits.  The policy limit therefore constitutes irrelevant evidence inadmissible under FED. R. EVID. 402.

Even if the policy limits constituted relevant evidence, that information should be excluded under FED. R. EVID. 403 for at least three reasons. First, the policy limit could be improperly and unfairly perceived by a jury as the celling of damages to be awarded in this case.  For that reason, any probative value the policy limit may have in this case would substantially be outweighed by the real danger that a damage award be unfairly capped by a jury at that limit.  Such a happenstance without a doubt constitutes unfair prejudice. Second, under the same reasoning just explained, disclosing the policy limit would potentially mislead the jury. Third, since the policy limit is not in controversy, disclosing that information may confuse the issues to be adjudicated in the case.

In sum, all documentary or testimonial evidence regarding policy limits should be excluded as irrelevant evidence under FED. R. EVID. 402.  If deemed relevant, the policy limits should still be excluded under FED. R. EVID. 403, as evidence which probative value is substantially outweighed by a danger to cause unfair prejudice, mislead the jury or confuse the issues.

**WHEREFORE,** it is respectfully requested that this Honorable Court take notice of the above.

**CERTIFICATION:** This motion has been filed through the Court's CF/ECF filing system which will notify all attorneys of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 13th day of January 2020.

> **PRV LAW OFFICE**
> Centro Internacional de Mercadeo
> 100 Carr. 165, Torre I, Oficina 404
> Guaynabo, Puerto Rico 00968
> www.prvlaw.com
> Tel: 787-299-5118

> s/Paúl A, Rodríguez Vélez
> Paúl A. Rodríguez Vélez
> USDC-PR No. 300008
> prodriguez@prvlaw.com

> s/Glenda Labadie Jackson
> Glenda Labadie Jackson
> USDC-PR No. 216606
> g_labadie@yahoo.com